```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

------------------------------x
SCOTTSDALE INSURANCE COMPANY,  :
                               :
          Plaintiff,           :
                               :
v.                             :     CASE NO. 3:09CV01319(AWT)
                               :
R.I. POOLS, INC., et al.,      :
                               :
          Defendants.          :
------------------------------x
```

**RULING ON MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Scottsdale Insurance Company ("Scottsdale"), brings this action against defendants R.I. Pools, Inc. ("R.I. Pools"), Vincenzo Iannone and Franco Iannone (the "Iannones"), and the owners of 19 swimming pools built by R.I. Pools. The owners of these 19 swimming pools have complained to R.I. Pools about cracking in the concrete walls and floors of their pools. The owners of three of the swimming pools have sued R.I. Pools. Scottsdale is seeking a declaratory judgment that it owes no duty to defend or indemnify R.I. Pools or the Iannones in connection with the claims made in lawsuits brought by pool owners Thomas Van Riper and Susan Van Riper (the "Van Ripers"), Andrew Peake and Kuei-Ying Peake (the "Peakes"), and Michael Steinharter and Mary Steinharter (the "Steinharters"), respectively, and any future lawsuits brought by the remaining pool owners. The plaintiff has moved for summary judgment. For the reasons set forth below, the plaintiff's motion is being granted.

**I. FACTUAL BACKGROUND**

Scottsdale is an insurance company incorporated in Ohio and with its principal place of business in Scottsdale, Arizona. R.I. Pools is a Connecticut corporation with its principal place of business in Norwalk, Connecticut. R.I. Pools builds swimming pools in Connecticut. Between September 3, 2005 and September 2, 2008, Scottsdale issued commercial general liability insurance policies to R.I. Pools (the "CGL Policies"). Franco Iannone is an officer of R.I. Pools and Vincenzo Iannone is an employee or agent of R.I. Pools.

R.I. Pools relies on other companies to supply it with concrete material to construct swimming pools. Prior to 2006, R.I. Pools obtained its concrete material from O&G Industries, Inc. Commencing in 2006, R.I. Pools obtained its concrete material from Paramount Concrete, Inc. ("Paramount"). Paramount would mix and deliver the concrete material to the job sites and did not perform any work in connection with swimming pool construction.

Beginning in 2007, pool owners began to file claims with R.I. Pools complaining of cracking in the concrete walls and floors of their swimming pools, for which Paramount had supplied the concrete. As of August 2009, three pool owners had commenced litigation against R.I. Pools.

In a complaint dated June 19, 2009, the Van Ripers alleged

that on June 22, 2006 R.I. Pools began the work necessary to "build an in-ground swimming pool, with appurtenant structures including stone deck." (Local Rule 56(a)(1) (Doc. No. 44) Exhibit A: Van Ripers Complaint ("Van Ripers Compl.") ¶ 5) The Van Ripers alleged that the "swimming pool failed; its concrete cracked, flaked, disintegrated and deteriorated." (Id. ¶ 8) They alleged that R.I. Pools began repairs on the swimming pool, "but unilaterally stopped work on the repairs, leaving on the Van Riper property, instead of a swimming pool, a large, unsightly, dangerous hole with exposed steel reinforcing structures and rough, un-faced, concrete sides." (Id. ¶ 11) They alleged they have been damaged as follows:

> As a consequence of the foregoing, the Van Ripers have suffered damages in the form of loss of use of their swimming pool, the risk of expense of repair or replacement of the swimming pool or parts thereof, the risk of loss and/or replacement of some or all appurtenant structures and surrounding landscape, the cost of investigation, testing, expert analysis and so forth, and the temporary or permanent loss of the benefit of their bargain with the defendant R.I. Pools.

(Id. ¶ 12)

In a complaint dated June 25, 2009, the Peakes alleged that on June 28, 2006 R.I. Pools began the work necessary to "build an in-ground swimming pool, with appurtenant structures including stone deck." (Local Rule 56(a)(1) (Doc. No. 44) Exhibit B: Peakes Complaint ("Peakes Compl.") ¶ 5) The Peakes alleged that the "swimming pool failed; its concrete cracked, flaked,

disintegrated and deteriorated." (Id. ¶ 8)  They alleged that R.I. Pools began repairs on the swimming pool, "drained the Peakes' swimming pool in order to do so, but unilaterally stopped work on the repairs, leaving the Peakes' swimming pool empty." (Id. ¶ 11) They alleged damages identical to the damages alleged by the Van Ripers.  (See id. ¶ 12)

In a complaint dated June 25, 2009, the Steinharters alleged that in the Spring of 2006 R.I. Pools "agreed to undertake and did undertake to install an in-ground shotcrete pool and spa." (Local Rule 56(a)(1) (Doc. No. 44) Exhibit C: Steinharters Complaint ("Steinharters Compl.") ¶ 6)  The Steinharters alleged that in the Summer of 2007 they observed "cracks in the coping of the Pool and Spa."  (Id. ¶ 10) They alleged that after repairs had been made by R.I. Pools, they observed in or around August 2007, that "the Pool and Spa was not retaining water and that cracks were present directly above the reduced water line and elsewhere."  Id. ¶ 12) The Steinharters alleged that after further repairs by R.I. Pools, in or around the Spring of 2008, they again observed "that the Pool and Spa had numerous cracks and failed to retain water."  (Id. ¶ 14) They alleged that despite additional work on the pool and spa by R.I. Pools, there were continuing problems.  (See id. ¶ 15-18)  They alleged damages flowing from R.I. Pools' failure to provide them with a fully operational pool and spa as required by the contract.  (See

id. ¶ 19)

R.I. Pools sought defense and indemnity coverage from Scottsdale for actual and potential claims by pool owners in connection with the defective concrete material supplied by Paramount. Scottsdale issued reservation-of-rights letters to R.I. Pools with respect to all the pool owners who had made complaints about their pools arising out of use of Paramount's concrete material, and Scottsdale agreed to defend R.I. Pools in the lawsuits brought by the Van Ripers, the Peakes and the Steinharters, subject to a complete reservation of rights.

**II. LEGAL STANDARD**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must

respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).

### III. DISCUSSION

"[C]onstruction of a contract of insurance presents a question of law . . . It is the function of the court to construe the provisions of the contract of insurance." Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co., 274 Conn. 457, 462 (2005)(citations omitted). In Hartford Cas. Ins. Co., the Connecticut Supreme Court set forth a comprehensive explanation of the standards for interpretation of an insurance policy, as well as those for construing the duty to defend:

> The [i]nterpretation of an insurance policy . . . involves a determination of the intent of the parties as expressed by the language of the policy . . . [including] what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . [A] contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy . . . [giving the] words . . . [of the policy] their natural and ordinary meaning . . . [and construing] any ambiguity in the terms . . . in favor of the insured . . .
>
> In construing the duty to defend as expressed in an insurance policy, [t]he obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the

> insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage. If the latter situation prevails, the policy requires the insurer to defend, irrespective of the insured's ultimate liability. . . . It necessarily follows that the insurer's duty to defend is measured by the allegations of the complaint. . . . Hence, if the complaint sets forth a cause of action within the coverage of the policy, the insurer must defend. . . . If an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured. . . .
>
> . . . Further, [i]t is well established . . . that a liability insurer has a duty to defend its insured in a pending lawsuit if the pleadings allege a covered occurrence, even though facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered.

Id. (citations omitted).

The CGL Policies cover "bodily injury" or "property damage" that is "caused by an 'occurrence'," (Local Rule 56(a)(1) Statement (Doc. No. 44) Exhibit D p. 1), and it is undisputed that what is at issue here is property damage. The CGL Policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. p. 14) However, the CGL Policies do not define the term "accident".

The Second Circuit has addressed the meaning of the term "accident" as used in the definition of the term "occurrence" in a commercial general liability policy. In Jakobson Shipyard, Inc. v. The Aetna Casualty & Surety Co., 961 F.2d 387 (2d Cir. 1992), the insured, a shipyard owner, sought a declaratory

judgment as to the liability insurer's obligation to defend a breach of warranty action by the buyer of two tugboats. The court held that the commercial general liability policy issued to the shipyard owner, which covered property damage caused by an "occurrence," did not cover a contract claim against the shipyard owner based on allegedly defective steering mechanisms installed in the tugboats by the shipyard owner because the defective steering mechanisms were not an "occurrence" under the terms of the policy. The court noted that:

> The complaint alleged that Jakobson's work product did not perform according to contract specifications due to Jakobson's failure to manufacture the steering mechanisms in a workmanlike manner. The damages sought were for damages to the tugs themselves resulting from the defective steering mechanisms. No damage to the property or persons of third parties was alleged or proven.

Id. at 389. The court noted that there was no pertinent ambiguity in the definition of the term "occurrence" and then discussed how the word "accident," as well as the phrase "continuous or repeated exposure to conditions," should be construed:

> Were we to construe the words "accident" or "continuous or repeated exposure to conditions" as encompassing damage to a product resulting from the product's failure to perform according to contract specifications, we would expand the agreed-upon coverage. An accident, given its dictionary meaning, is "an event or condition occurring by chance or arising from unknown or remote causes." Webster's Third New International Dictionary 11 (1981). We might add that in common parlance an external force of some kind is usually involved. However, the faulty steering on the tugboats sold to Express was the result of faulty workmanship that did not comply with the

> specifications of the contract and Express's action sounded in contract. There was no chance occurrence, no unknown or remote cause, and no unexpected external force.
>
> Nor is a conclusion that the damages sustained by the tugs due to their steering malfunctions resulted from "continuous or repeated exposure to conditions" sustainable. As the district court stated, the phrase refers to "the repeated action of external forces resulting in damage." Express did not claim that outside forces caused the tugs' steering to fail.

Id.

The court in Jakobson distinguished Aetna Casualty & Surety Co. v. General Time Corp., 704 F.2d 80 (2d Cir. 1983). It summarized the material facts in that case as follows:

> That case involved a breach of warranty claim against the insured for motors it sold to Flair Manufacturing Company. The motors were used by Flair as component parts in radiators that it manufactured. When the motors malfunctioned, Flair sued General Time for breach of warranty and eventually settled the case for $1,180,000. General Time was insured by Aetna under both a CGL policy and an umbrella policy. When Aetna sued to recover its contribution to the settlement, the district court found that the damage caused by General Time's breach of warranty constituted an "occurrence" because the defective motors caused damage to other property of Flair that had not been purchased from General Time. The motors were thus an external force with regard to the radiators. The faulty steering mechanisms in the instant case did not damage property other than the tugs purchased from Jakobson under the contractual arrangements in question.

Id. at 389-90. Thus, in determining whether there had been an "occurrence," the court emphasized the distinction between mere existence of faulty workmanship that constitutes a breach of warranty and damage to other property that was a consequence of the faulty workmanship.

In J.Z.G. Resources, Inc. v. King, 987 F.2d 98 (2d Cir. 1993), a real estate developer sued a road excavation company and the company's commercial general liability insurer for damages arising out of the road excavation company's alleged defective workmanship in constructing and installing roads in a subdivision. The insurance policy required that the "'property damage' be caused by an 'occurrence.' 'Occurrence,' in turn, was defined as 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.'" Id. at 101. The court observed that "the central issue on this appeal is whether the damage to the roads at Peach Brook Farms resulted from an 'accident.'" Id. The court noted that the district court had concluded that the damage did result from an accident. The district court's analysis was that:

> The errors made by King were accidental to the extent that he did not intend to build the roads in the wrong place at the wrong elevations. It was not an accident, however, in the popular use of the word as a single event.

Id. at 102. The court disagreed with this analysis, making a distinction between a claim that was simply one for faulty workmanship and a claim that was for "consequential property damage inflicted upon a third party as a result of the insured's activity." Id. The court then cited to the analysis in Jakobson.

In J.Z.G. Resources, the court cited with approval United

States Fidelity & Guaranty Corp. v. Advance Roofing & Supply Co., 163 Ariz. 476 (Ct. App. 1990). There, the court concluded, in a case where a roofing contractor was sued for failure to complete work in accordance with contract requirements, that "mere faulty workmanship standing alone, cannot constitute an occurrence as defined in the policy, nor would the cost of repairing the defect constitute property damages." Id. at 103 (internal quotation omitted). In addition, the court cited with approval Hawkeye-Security Insurance Co. v. Vector Construction Co., 185 Mich. App. 369 (1990), where an insured concrete contractor, who was liable to a third party for providing defective concrete, sought coverage for claims by the third party. The court held that "the defective workmanship of [the insured contractor], standing alone, was not the result of an occurrence within the meaning of the insurance contract." Id.

While Jakobson, J.Z.G. Resources and General Time Corp. are all diversity actions involving the application of New York law, the definition of the term "accident" under Connecticut law is in all material respects substantially the same as the definition of that term under New York law.

> Under Connecticut law, "an accident is an unintended occurrence." Hammer v. Lumberman's Mut. Cas. Co., 214 Conn. 573, 590, 573 A.2d 699 (1990); see also Commercial Contractors Corp. v. American Ins. Co., 152 Conn. 31, 42, 202 A.2d 498 (1964) ("the term 'accident' is to be construed in its ordinary meaning of an 'unexpected happening' ... the 'accident' was the event causing injury, not the cause of that event."); Buell, 259 Conn.

at 541, 791 A.2d 489 (defining "accidental" to mean unexpected or unintended). An "accident" has been further defined as a "sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance or a combination of causes and producing an unfortunate result." Stach v. Farm Family Cas. Ins. Co., 2002 WL 853589, *5, 2002 Conn. Super. LEXIS 1174, *15 (Conn. Super. April 9, 2002).

Hermitage Ins. Co. v. Sportsmen's Athletic Club, 578 F. Supp. 2d 399, 402 (D. Conn. 2008). See also Middlesex Ins. Co. v. Mara, 699 F. Supp. 2d 439, 447-448 (D. Conn. 2010).

Moreover, in Metropolitan Life Ins. Co. v. Aetna Casualty & Surety Co., 255 Conn. 295 (2001), the Connecticut Supreme Court cited with approval cases applying New York law when interpreting the term "occurrence" in a commercial general liability policy.

> Although the term occurrence is not defined in the policies, the Second Circuit Court of Appeals, applying New York law consistently has held that it is unambiguous. . . . see also Arthur A. Johnson Corp. v. Indemnity Ins. Co. of North America, supra, at 228, 196 N.Y.S.2d 678, 164 N.E.2d 704 (defining "accident" as "an event of unfortunate character that takes place without one's foresight or expectation. . . . That is, an unexpected, unfortunate occurrence." [Citation omitted; internal quotation marks omitted.]).

Id. at 307. See also Philbin Bros., LLC v. Hartford Fire Ins. Co., No. X10UWYCV075007640S, 2008 WL 5540428 (Conn. Super. Dec. 11, 2008)(allegations in the underlying action did not fit the description of an "accident" where buyers of a house brought claims against insured builder and the claims in the underlying action focused on two areas: (i) the construction was not performed in a workmanlike manner, and (ii) the builder failed to

warn the buyers of the risk created by the builder's poor construction or the adverse effects of placing a pool table on the first floor of the house); Times Fiber Communications., Inc. v. Travelers Indem. Co., No. CVX05CV030196619S, 2005 WL 589821, *10 (Conn. Super. Feb. 02, 2005)("the 'accident' is 'the event' causing the injury, not the cause of that event," so the installation of the non-conforming cable was not the "accident" and there was no coverage for "alleged loss of use of property . . . based entirely on harm which resulted from repair activities necessary to replace the nonconforming cable").

Thus, although an accident can be a consequence of faulty workmanship, faulty workmanship alone is not an accident. Accordingly, the CGL Policies do not cover the claims against R.I. Pools for faulty workmanship.

In addition, R.I. Pools and the Iannones contend that the complaints in the underlying lawsuits include claims that go beyond claims for faulty workmanship by R.I. Pools. The court disagrees. The complaints in the actions brought by the Van Ripers and the Peakes do allege risk of loss and/or replacement of appurtenant structures and surrounding landscaping, in addition to loss of use and expense of repair of their pools. However, those damages or potential damages are alleged to be either an inability to use the appurtenant structures built by R.I. Pools because of faulty workmanship or harm resulting from

-14-

necessary repair activities. See <u>Times Fiber Communications., Inc.</u>, 2005 WL 589821 (no coverage for alleged loss of use of property based on harm resulting from repair activities). The damages or potential damages are not alleged to be the result of an "accident" that occurred as the result of faulty workmanship.

Therefore, because the complaints in the underlying lawsuits against R.I. Pools and others do not allege harm that was the result of an accident, there is no claim or potential claim under the CGL Policies for property damage caused by an "occurrence." Accordingly, the plaintiff is entitled to summary judgment.

**IV. CONCLUSION**

For the reasons set forth above, the plaintiff's Motion for Summary Judgment (Doc. No. 42) is hereby GRANTED. The Clerk shall enter judgment in favor of Scottsdale Insurance Company declaring that:

    A.    Scottsdale Insurance Company does not have a duty to defend R.I. Pools, Inc. and its officers against the claims and suits of the swimming pool owners;

    B.    Scottsdale Insurance Company does not have a duty to indemnify R.I. Pools, Inc. and its officers for any settlement or judgment in connection with the claims and suits of the swimming pool owners; and

    C.    R.I. Pools, Inc. and its officers are obligated to

reimburse Scottsdale Insurance Company for the cost of the defense against the claims and suits of the swimming pool owners.

The Clerk shall enter judgment in favor of Scottsdale Insurance Company as to all the defendants and close this case.

It is so ordered.

Signed this 22nd day of September, 2010 at Hartford, Connecticut.

                                              /s/AWT
                                     Alvin W. Thompson
                            United States District Judge